# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| THE NATIONAL COUNCIL OF AGRICULTURAL EMPLOYERS, 525 9th Street, NW, Suite 800 Washington, DC 20004, | |
| Plaintiff, v. | Civil Action No. 1:22-cv-3569 |
| UNITED STATES DEPARTMENT OF LABOR, 200 Constitutional Avenue, NW Washington, DC 20210, | **COMPLAINT** |
| THE EMPLOYMENT AND TRAINING ADMINISTRATION, 200 Constitutional Avenue, NW Washington, DC 20210, | |
| THE WAGE AND HOUR DIVISION, 200 Constitutional Avenue, NW Washington, DC 20210, | |
| THE OFFICE OF THE FEDERAL REGISTER, 7 G Street, NW, Suite A-734 Washington, DC 20401, | |
| MARTY WALSH, in his official capacity as Secretary of the United States Department of Labor, 200 Constitutional Avenue, NW Washington, DC 20210, | |
| OLIVER POTTS, in his official capacity as Director of the Office of the Federal Register, 7 G Street, NW, Suite A-734 Washington, DC 20401, | |
| BRENT PARTON, in his official capacity as Principal Deputy Assistant Secretary of the Employment and Training Administration, 200 Constitutional Avenue, NW Washington, DC 20210, | |

JESSICA LOOMAN, in her official capacity as
Principal Deputy Administrator of the Wage
and Hour Division,
200 Constitutional Avenue, NW
Washington, DC 20210,

       Defendants.

## NATURE OF ACTION

1.    The Employment and Training Administration ("ETA"), the Wage and Hour Division ("WHD"), and the United States Department of Labor ("DOL") have unlawfully repealed a final rule duly issued, prescribed, or promulgated to achieve DOL's statutory mandate set forth in the Immigration and Nationality Act (the "INA" or the "Act," codified at 8 U.S.C. § 1101 *et seq*.), as amended by the Immigration Reform and Control Act of 1986, to ensure that farmers and ranchers in the United States are able to employ temporary foreign workers to perform agricultural labor or services, as certified by DOL, when there is a lack of available, willing, and able United States workers at the time and place of employment, and to protect United States workers from any adverse effect of employing such foreign workers.  Specifically, "Action: Final Rule. Temporary Agricultural Employment of H-2A Nonimmigrants in the United States," attached as Exhibit A, (hereinafter "the Trump Final Rule") modernized the H-2A Temporary Agricultural Labor Certification Program ("the H-2A program") by streamlining and enhancing employer access to a legal source of agricultural labor, while maintaining protections for temporary foreign and United States workers.  On information and belief, the Trump Final Rule was duly issued, prescribed, or promulgated because it had been (a) signed by the responsible ETA and WHD officials (former Assistant Secretary of Employment and Training John Pallasch and former Wage and Hour Administrator Cheryl Stanton); (b) sent to the Office

of the Federal Register ("OFR") for publication; (c) published in full decisional text form on DOL's website; (d) publicized in a DOL press release as a final agency decision to be published in the Federal Register; (e) discussed in a stakeholder briefing regarding significant rulemaking on the H-2A Visa Program; and (f) scheduled for public inspection and publication by OFR.  As a result, the Trump Final Rule was "valid as against" all persons under the Federal Register Act ("FRA") and was duly issued, prescribed, or promulgated under the Administrative Procedure Act ("APA"), and could not legally be repealed without public notice first proposing such repeal, explaining the rationale for it, providing the opportunity for public comment, and considering and responding to any such comments in the preamble to the final rule.  Moreover, such repeal constitutes a clear and abrupt reversal of the legal, policy, and factual findings by DOL, ETA, and WHD, that necessitated the adoption of the Trump Final Rule without any explanation whatsoever to support that reversal; as a matter of law, therefore, such repeal was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

2.      Among other policy reasons, the U.S. Congress enacted the INA, and its subsequent amendments, to regulate and control the process of admitting temporary foreign agricultural workers to the United States to perform agricultural labor or services as defined by DOL.  8 U.S.C. § 1101(a)(15)(H)(ii)(a); *see also* 8 U.S.C. § 1184(c)(1), §1188.

3.      The Secretary of Labor ("The Secretary") has delegated the authority to issue temporary agricultural labor certifications granted under the INA to the Assistant Secretary for Employment and Training, who in turn has delegated that authority to ETA's Office of Foreign Labor Certification ("OFLC").  *See* Secretary's Order 06-2010 (Oct. 20, 2010), 75 Fed. Reg. 66268 (Oct. 27, 2010).  In addition, the Secretary has delegated to WHD the responsibility under 8 U.S.C. § 1188(g)(2) to assure employer compliance with the terms and conditions of

employment under the H-2A program.  *See* Secretary's Order 01-2014 (Dec. 19, 2014), 79 Fed. Reg. 77527 (Dec. 24, 2014).

4.      On July 26, 2019, DOL published a proposed rule entitled "Temporary Agricultural Employment of H-2A Nonimmigrants in the United States," seeking public comment and giving the public a 60-day comment period to participate in the notice and comment rulemaking process.  *See* 84 Fed. Reg. 36168 (July 26, 2019).  By September 24, 2019, the comment period closing date, DOL received a remarkable 83,541 comments from the public on the proposed rulemaking.  In due consideration of the 83,541 comments, DOL, ETA, and WHD, duly issued, prescribed, and promulgated the Trump Final Rule on January 15, 2021, in accordance with the APA and the FRA.

5.      On information and belief, Assistant Secretary of Employment and Training John Pallasch and Wage and Hour Administrator Cheryl Stanton duly issued, prescribed, and promulgated the Trump Final Rule by signing it; by placing its text on a DOL website in full decisional form with a statement that it had been sent to the Federal Register for publication; by describing it in a detailed agency press release, attached as Exhibit B, which was widely read by and distributed among the regulated public; by inviting and holding a stakeholder briefing call to discuss significant rulemaking on the H-2A Visa program, attached as Exhibit C (stakeholder call email); and by transmitting it to OFR for scheduling for placement on public inspection and publication.

6.      Pallasch and Stanton caused the Trump Final Rule to be sent to OFR on January 15, 2021; however, OFR never published it in the Federal Register because on January 20, 2021, a Federal holiday (Inauguration Day), the incoming Biden Administration announced it was withdrawing it.  Exhibit D, hereto (hereinafter "the Withdrawal Announcement").

7.      In the Withdrawal Announcement, the Biden Administration stated that the Trump Final Rule (which is in fact characterized there as a "final rule") had been withdrawn from Federal Register publication "for the purpose of reviewing issues of law, fact, and policy raised by the rule."  *See* Exhibit D.

8.      On July 22, 2022, the United States Court of Appeals for the District of Columbia Circuit held that a rule becomes final once OFR has made it available for public inspection. *Humane Society of the U.S. v. USDA*, 41 F.4th 564, 575 (D.C. Cir. 2022). ("[A]gencies may repeal a rule made available for public inspection in the Office of the Federal Register only after complying with the APA's procedural requirements.").  The Court there chose not to address the argument, which was expressly raised by the plaintiff, that a rule in fact can become final before OFR posts it for public inspection because it was not presented by the facts in that particular case.  *Id*. ("Because the rule was final once OFR made it available for public inspection, we need not address the Humane Society's alternative argument that it passed this threshold even earlier when the Department posted the rule on its website."). But the Court nevertheless left open the question whether OFR public inspection is ***not*** the earliest a rule is promulgated (and thus final), and accordingly requires notice and comment rulemaking to legally repeal.  *Id*. at 570 ("If an agency can prescribe a rule without publishing it, then publication cannot mark the point at which the requirement to undertake notice and comment before repeal attaches.").

9.      Subsequently, on October 12, 2022, the Biden Administration published in the Federal Register a new purported "final rule" entitled "Temporary Agricultural Employment of H–2A Nonimmigrants in the United States."  87 Fed. Reg. 61660 (Oct. 12, 2022) (to be codified at 20 C.F.R. 653 and 655, and 29 C.F.R 501) (hereinafter "the Biden Final Rule").  The Biden Final Rule purports to have an effective date of November 14, 2022, with a transition period such

that it affects applications filed for start dates of need on or after February 13, 2023, (but not before).

10.     The Biden Final Rule did not invoke the "good cause" exception of the APA allowing an agency to dispense with notice and comment rulemaking when such procedures would be "impracticable, unnecessary, or contrary to the public interest."  5 U.S.C. § 553(b)(3)(B).  Nor is any good cause present and asserting so now would be an impermissible *post hoc* rationalization.

11.     The earliest a farmer, rancher, or Farm Labor Contractor ("FLC") can file for a start date of need of February 13, 2023, is November 30, 2022.

12.     Plaintiff now seeks declaratory and injunctive relief, as well as costs and attorney fees, including an order enjoining the implementation of the Biden Final Rule and declaring that it was illegally promulgated for failing to comply with the requirements of the APA and FRA regarding notice and comment rulemaking, and any other relief that may be just and proper.

## PARTIES

13.     Plaintiff National Council of Agricultural Employers ("NCAE") is a non-profit national trade association headquartered in Washington, D.C., focusing exclusively on agricultural labor issues from the employer's viewpoint, to include the H-2A Program.  NCAE represents approximately 80% of U.S. farm and ranch employers, as well as their agents and trade associations.  NCAE also represents about 85% of the farm and ranch families presently utilizing the H-2A Temporary Agricultural Worker Visa Program.  NCAE is a leading public policy advocate for agricultural employers and has a longstanding interest in educating its membership and the community regarding employment and labor matters.

14.     NCAE brings this action on behalf of its members.  The interests NCAE seeks to protect are germane to its organizational purpose, and neither the claim nor the relief requested requires the participation of individual members; although some, if not all, NCAE members would otherwise have standing to sue because they have suffered or will suffer concrete and imminent injury if the illegal Biden Final Rule is not set aside.

15.     NCAE membership includes farmers and ranchers across the United States in labor-intensive agriculture; other regional trade associations focused on educating agricultural employers with the complex and bureaucratic H-2A Program; H-2A Program filing agents and attorneys who assist agricultural employers with navigating the complex and bureaucratic H-2A Program; FLCs who provide labor to thousands of farms and ranches that do not have, on their own, the ability to meet all of the complex regulatory and administrative requirements of the H-2A Program; and surety companies who provide the surety bonds FLCs are required to obtain to participate in the H-2A Program.

16.     Defendant DOL is a federal government agency within the meaning of 5 U.S.C. § 552(f)(1) and is entrusted with enforcement of the INA and the promulgation of rules and regulations thereto.

17.     Defendant ETA is a federal government agency within the meaning of 5 U.S.C. § 552(f)(1) and is tasked by DOL with enforcement of the INA and the promulgation of rules and regulations thereto.  DOL is the parent agency of ETA.

18.     Defendant WHD is a federal government agency within the meaning of 5 U.S.C. § 552(f)(1) and is tasked by DOL with enforcement of the INA and the promulgation of rules and regulations thereto.  DOL is the parent agency of WHD.

19.      Defendant OFR is a federal governmental agency within the meaning of 5

U.S.C. § 552(f)(1) and is entrusted with the publication of the Federal Register.

20.     Defendant Marty Walsh is the Secretary of DOL and has ultimate responsibility for decisions made by DOL, and by ETA and WHD, as agencies within his Department. Plaintiff sues Secretary Walsh in his official capacity.

21.     Defendant Oliver Potts, Director of OFR, is the agency's highest-ranking official and is charged with the supervision and management of all decisions and actions of that agency. Plaintiff sues Director Potts in his official capacity.

22.     Defendant Brent Parton is the Principal Deputy Assistant Secretary of ETA and is the Acting Assistant Secretary of Employment and Training who is charged with the supervision and management of the agency's decisions and actions.  Plaintiff sues Principal Deputy Assistant Secretary Parton in his official capacity.

23.     Defendant Jessica Looman is the Principal Deputy Administrator of WHD and is the Acting Administrator of Wage and Hour who is charged with the supervision and management of the agency's decisions and actions.  Plaintiff sues Principal Deputy Administrator Looman in her official capacity.

## JURISDICTION AND VENUE

24.     This action arises under APA, 5 U.S.C. §§ 551, 553, 701–706, the FRA, 44 U.S.C. § 1503, and the INA.  The Court has subject matter jurisdiction pursuant to these provisions and 28 U.S.C. § 1331.

25.     This Court has the authority to issue the requested declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201–02 and 5 U.S.C. §§ 702–706, and to award costs and counsel fees pursuant to 28 U.S.C. § 2412.

26.     Venue is proper in this Court under 28 U.S.C. § 1391(e).   This action is brought against officers and agencies of the United States, and Defendants maintain offices in the District of Columbia.   Venue is also proper under 28 U.S.C. §§ 1391(b)–(c) because Plaintiff NCAE resides in and has its principal place of business in this judicial district, and a substantial part of the events or omissions giving rise to this action occurred in this judicial district.

## STATUTORY FRAMEWORK

### *The Administrative Procedure Act*

27.     The APA defines "agency action" to include *inter alia* "the whole or a part of an agency rule," 5 U.S.C. § 551(13), and defines "rule," in turn, as the "whole or a part of an agency statement of general or particular applicability and future effect designed to implement . . . or prescribe law or policy . . . "   *Id*. § 551(4).

28.     "Rule making" is the "process [of] formulating, amending, or repealing a rule." *Id.* § 551(5).   APA Section 553 mandates procedural requirements for rulemaking and typically requires that a "[g]eneral notice of proposed rule making shall be published in the Federal Register," but establishes an exception from Federal Register publication when "persons subject thereto are named and either personally served or *otherwise have actual notice thereof* in accordance with the law."   *Id.* § 553(b) (emphasis added).   The APA provides an exception to notice requirement if an "agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest."   *Id.* § 553(b)(3)(B).   "After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments . . . " *Id.* § 553(c).

29.     "After consideration" of the written data, views, or arguments presented by interested persons, "the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose."  *Id.*   "[P]ublication or service of" this final rule must occur "not less than 30 days before its effective date."  *Id.* § 553(d).

30.     The APA provides for judicial review of any "final agency action for which there is no other adequate remedy in a court"—including the promulgation and repeal of a final rule.   "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."  *See id.* §§ 702, 704.

31.     The APA requires a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *Id.* § 706(2)(A).   An agency action is arbitrary and capricious if the agency's analysis is internally inconsistent or inadequately explained, or if it diverges from prior policies and standards without providing a reasoned explanation for why the agency changed course.

32.     The APA requires a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . without observance of procedure required by law."  *Id.* § 706(2)(D).  An agency is required by the APA to provide the public with notice and opportunity to be heard when a rulemaking is not interpretative, a general statement of policy, rules of agency organization, procedure, or practice, or when an agency finds and articulates good cause.  *Id.* § 553(b).

### *The Federal Register Act*

33.     The FRA directs that "[t]here shall be published in the Federal Register . . .

documents or classes of documents that may be required so to be published by Act of Congress."  44 U.S.C. § 1505(a)(3).

34.    OFR is responsible for the prompt and uniform printing and distribution of documents required to be published in the Federal Register.  *See* 44 U.S.C. § 1502.   The FRA requires that documents to be published in the Federal Register be transmitted to OFR for processing prior to publication.  *See id.* § 1503.   Upon receipt, OFR must make each document "immediately available for public inspection," and must transmit each document "immediately to the Government Publishing Office for printing" in the Federal Register.  *Id.*

35.    OFR's regulations to implement the FRA allow for withdrawal of documents prior to publication only where necessary to correct extensive errors.   1 C.F.R. § 18.13(a) ("Withdrawal or correction of filed documents") provides: "A document that has been filed for public inspection with the Office of the Federal Register but not yet published, may be withdrawn from publication or corrected by the submitting agency.  Withdrawals or minor corrections may be made with a timely letter, signed by a duly authorized representative of the agency.   Extensive corrections may require agency withdrawal of the document from publication."

36.    Reference to § 18.13 appears in OFR's Document Drafting Handbook in Chapter 5: "How Do I Correct A Document?"   That chapter discusses withdrawing a document from publication where necessary to make more extensive corrections and if necessary, withdrawing the entire document from publication.   *See NAT'L ARCHIVES AND RECS. ADMIN., OFFICE OF THE FED. REG., DOCUMENT DRAFTING HANDBOOK* §§ 5.2–5.3 (2020), https://www.archives.gov/files/federal-register/write/handbook/ddh.pdf.

37.    OFR's Document Drafting Handbook discusses withdrawing a document from

publication both before and after OFR files the document for publication in § 5.2.  If a document is to be removed before filing, the "Liaison Officer may telephone the OFR during *regular office hours* (8:45 a.m. to 5:15 p.m. ET) to request that we withdraw the document from publication." *Id*. § 5.3 (emphasis added).  Further, a letter must be received by 4:00 pm on a *business day before* the document is scheduled for public inspection to ensure it can be removed from the next day's public inspection list.

38.     OFR's regulations to implement the FRA outline procedure and timing for regular schedule filing are contained at 1 C.F.R. § 17.2.  Under this regulation when a "Federal holiday intervenes, one additional work day is added" to the schedule.  1 C.F.R. § 17.2(c).

39.     OFR's Document Drafting Handbook discusses the regular schedule filing time in § 8.8 and states that "[d]ocuments received before 2 p.m. are on a 3-day schedule, and those received after 2 p.m. are on a 4-day schedule."

40.     Under the FRA, "[a] document required . . . to be published in the Federal Register *is not valid as against a person who has not had actual knowledge of it* until . . . the document ha[s] been filed with the Office of the Federal Register and a copy made available for public inspection . . . "  44 U.S.C. § 1507 (emphasis added).

### *The Freedom of Information Act*

41.     The Freedom of Information Act ("FOIA") provides that "[e]ach agency shall separately state and currently publish in the Federal Register for the guidance of the public . . . (D) substantive rules of general applicability adopted as authorized by law. . . ."   5 U.S.C. § 552(a)(1)(D).

42.     FOIA sets forth the following exception:  "Except to the extent that a person has actual and timely notice of the terms thereof, a person may not in any manner be required to

resort to, or be adversely affected by, a matter required to be published in the Federal Register and not so published."  *Id*. § 552(a).

## **FACTUAL BACKGROUND**

43.     On May 24, 2018, then Secretaries of Labor, Homeland Security, Agriculture, and State (Secretaries Acosta, Nielsen, Perdue, and Pompeo, respectively) announced a coordinated effort of "streamlining, simplifying, and improving the H-2A temporary agricultural visa program – reducing cumbersome bureaucracy and ensuring adequate protections for U.S. workers."  Exhibit E (press release).

44.     This coordinated effort kicked off over a year of interagency work developing the Trump Notice of Proposed Rulemaking ("NPRM") that was officially published in the Federal Register on July 26, 2019.  *See* 84 Fed. Reg. 36168.  The NPRM was entitled "Temporary Agricultural Employment of H-2A Nonimmigrants in the United States."  The NPRM had a 60-day public comment period during which DOL received 83,541 comments from the public on the proposed rulemaking.

45.     Over the next year and several months, DOL, ETA, and WHD, analyzed the 83,541 comments and in consideration of those comments developed a final rule that streamlined and modernized the H-2A Program by allowing farmers and ranchers to navigate the complex program more easily and reducing cost burdens for participating in the H-2A program.

46.     On January 14, 2021, Deputy Chief of Staff of United States Department of Agriculture ("USDA") Blake Rollins sent a message to stakeholders from the Office of Public Liasson at DOL indicating that ETA was holding a stakeholder call on January 15, 2021, at 11:00 am "regarding significant rulemaking on the H-2A Visa Program."  Exhibit C (stakeholder call email).

47.     On January 15, 2021, prior to the ETA stakeholder call, DOL, ETA, and WHD, caused to be signed and sent to OFR the final agency action that was the Trump Final Rule. Prior to the ETA stakeholder call published a copy of the Trump Final Rule on its website along with a press release announcing the "issuing [of] this final rule in response to the extensive public comments received from farmers, farmworkers, as well as advocates and associations for both groups from across the country." Exhibit B.

48.     The regulated public, including Plaintiff, had actual knowledge of the Trump Final Rule being a final agency action through its publication on a DOL website, through the stakeholder call held on January 15, 2022, through the press releases issued by both DOL and the Secretary of Agriculture, and through stakeholders disseminating information and press releases to membership.  *See* Exhibit F (USDA Press Release).

49.     The Trump Final Rule allows employers to file one application for multiple dates of need throughout the year, cutting down on the administrative burden of utilizing the H-2A program as well as the cost associated with filing applications at both DOL and the United States Citizenship and Immigration Service.  *See* Exhibit A at 603–605.

50.     The Trump Final Rule allows State Workforce Agencies, the entities charged with inspecting H-2A housing, to certify housing every 24 months instead of for each application, significantly reducing the administrative burden on employers who annually file multiple H-2A applications.  *See* Exhibit A at 586–587.

51.     The Trump Final Rule eases the burden on employers from being required to continue to hire United States workers that show up through 50% of a work contract after H-2A workers have already arrived and been working on that contract.  *See* Exhibit A at 615.

52.     The Trump Final Rule allows employers to add additional worksites after certification, instead of having to file a whole new H-2A application.  *See* Exhibit A at 643– 644.

53.     The Trump Final Rule made it clear that transportation and subsistence costs that are to be reimbursed to H-2A workers are calculated from the United States Consulate at which they were processed and not from the place of recruitment, which is often difficult to determine. *See* Exhibit A at 591.

54.     The Trump Final Rule provided flexibility by creating a reduced surety bond for small FLCs seeking to hire fewer than ten H-2A workers.  *See* Exhibit A at 609.

55.     The Trump Final Rule streamlined the program by allowing employers to optionally begin recruitment of United States workers prior to DOL issuing a first action, reducing the time it takes for an employer to be certified under the H-2A Program.  *See* Exhibit A at 600–601.

56.     Because of intervening Federal holidays, the Trump Final Rule was never placed on public inspection by OFR before the incoming Biden Administration took office on January 20, 2021.

57.     On January 20, 2021, the Biden Administration posted an announcement to a DOL website that said it was withdrawing the Trump Final Rule to review issues of law, fact, and policy—not to make corrections of any errors as contemplated by the OFR regulations.  *See* Exhibit D.

58.     The Trump Final Rule remains posted to this day on the DOL website: https://www.dol.gov/sites/dolgov/files/ETA/oflc/pdfs/H-2A-2020-final-rule-1_8_2021-Clean-with-disclaimer.pdf [https://perma.cc/YGT7-ZLBJ] (last visited November 23, 2022).

59.     Subsequent to the purported withdrawal of the Trump Final Rule, DOL, ETA, and WHD did not undertake notice and comment of any kind or indicate how they planned to rescind the Trump Final Rule officially.

60.     OFR has not published the Trump Final Rule and allowed for DOL to withdraw the Trump Final Rule on a Federal holiday (Inauguration Day).  OFR's guidance to agencies requires an agency to notify it during normal business hours the day before publication of an agency's intention to withdraw a document from publication in the Federal Register.  Further, OFR requires agencies to provide at least one business day before a document is scheduled for publication to withdraw a document.

61.     Based on OFR's regulations the Trump Final Rule should have been put on public inspection on January 21, 2022; instead OFR allowed the Trump Final Rule to be withdrawn on a Federal holiday (Inauguration Day), a day in which OFR was closed.

62.     On or about July 15, 2022, the Biden Administration sent the Biden Final Rule to the Office of Information and Regulatory Affairs at Office of Management and Budget for interagency final review.  During this review only six Executive Order 12866 meetings were conducted, a stark contrast with the 83,541 comments that were received in response to the Trump NPRM.  One of these meetings was with Plaintiff, at its request, on August 11, 2022, in which DOL failed to have anyone attend from ETA or WHD, even though they are the agencies charged with administering and enforcing the H-2A Program.

63.     On October 6, 2022, DOL published an announcement on its website stating that the Biden Final Rule was impending publication in the Federal Register on October 12, 2022, and was on public inspection.

64.     On October 12, 2022, OFR published the Biden Final Rule in the Federal Register with a purported effective date of November 14, 2022.

65.     The Biden Final Rule included a transition period of 90 days from its effective date in which applications under the H-2A Program with start dates prior to the 90th day after the effective date are to be processed under the 2010 H-2A Final Rule and applications with start dates on or after the 90th day are to be processed under the Biden Final Rule.

66.     Because of the requirements to file prior to an employer's date of need, November 30, 2022, is the earliest date that an employer's application under the H-2A Program could be processed under the Biden Final Rule.

67.     The Biden Final Rule purports to rescind all of the program flexibilities the Trump Final Rule included, such as the flexibility to file one application with multiple start dates, 24 months housing inspections, the ability to add worksites after certification, the relaxed requirement to continue to hire 30 days after the start date, the clarity on where transportation and subsistence reimbursements are calculated from, and reduced surety bond requirements for FLCs seeking to hire nine or less H-2A workers.

68.     The Biden Final Rule also increases the surety bond requirement for FLCs to the extent that many FLCs and surety companies will not be able to meet the bonding requirements, effectively removing FLCs from the ability to use the H-2A Program to supply farmers and ranchers with the legal labor they need to provide the United States with food security, directly in contravention of Congressional intent in creating the H-2A program.

69.     The increased surety bond amounts contemplated in the Biden Final Rule contained no evidence or factual information other than an assertion that "bond amounts . . .

often are insufficient to cover the wages and benefits owed by labor contractors."  87 Fed. Reg. at 61735.

70.     Further, the Biden Final Rule provided no evidence or factual information that DOL had in fact "called" on a surety bond to cover damages and that the surety amount was insufficient to cover those damages.

71.     One of the largest underwriters of surety bonds for H-2A FLCs has never had DOL "call" on a surety bond for payment of damages when an H-2A FLC has failed to pay.

72.     The increased surety bond face values contemplated in the Biden Final Rule will cause some surety companies to refuse to provide surety bonds due to the uncertainty of how it will affect the bonding market.

73.     The increased surety bond face values contemplated in the Biden Final Rule will create a situation in which H-2A FLCs will have to carry bonds with such large face values for successive years that sureties will refuse subsequent surety bonds to them thus precluding them from being able to use the H-2A Program and subsequently jeopardizing their businesses.

74.     The Biden Final Rule goes against decades of practice in conducting prevailing wage surveys by State Workforce Agencies allowing for other state agencies to conduct the surveys and relaxing the requirements for survey certification to the extent that the survey cannot be statistically valid any longer.

75.     The Biden Final Rule will make prevailing wage surveys between four and five times less accurate than those conducted under the decades of previous practice.

76.     The Biden Final Rule will result in systematically higher rates of wage inflation in the H-2A Program because DOL cannot certify a prevailing wage that is less than the Adverse

Effect Wage Rate ("AEWR"), so only prevailing wage surveys that exceed the AEWR can be certified.

77.     When an agency's rulemaking proceedings have culminated, as with the Trump Final Rule, new notice and comment procedures are required.  *See, e.g., AFL-CIO v. Chao*, 496 F. Supp. 2d 76, 83 (D.D.C. 2007) (citing *Action on Smoking and Health v. Civil Aeronautics Bd.*, 713 F.2d 795, 800 (D.C. Cir. 1983)).

78.     The Trump Final Rule was the consummation of DOL's decision-making process as it was signed by designated agency officials after the review of an extensive comment record, sent to OFR for publication as a final rule, published to a DOL website where the regulated community and general public at large had actual knowledge of its contents, a stakeholder call to discuss "significant rulemaking on the H-2A Visa program" was held with the public, a press notice was posted on the DOL website articulating this was a final rule, and rights and/or obligations would be determined and/or legal consequences would flow from such action. *United States Army Corps of Eng'rs v. Hawkes Co.,* 578 U.S. 590, 597 (2016) (citing *Bennett v. Spear*, 520 U.S. 154 (1997)) ("First, the action must mark the consummation of the agency's decisionmaking process — it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow.").

79.     Plaintiff has experienced actionable harm because it was "depriv[ed] of a procedural protection to which [it is] entitled under the APA."  *See Northern Mariana Islands v. United States*, 686 F. Supp. 2d 7, 17 (D.D.C. 2009) (citing *Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89, 94–95 (D.C. Cir. 2002)).  Allowing Defendants to ignore APA procedure would render section 553 "a dead letter."  *Sugar Cane Growers*, 289 F.3d at 95.

80.     Because Defendants did not either produce the Biden Final Rule through notice and comment rulemaking or articulate in the Biden Final Rule a good cause analysis for dispensing with the notice and comment requirements of the APA, the Biden Final Rule is invalid and must be vacated.  *See AFL-CIO*, 496 F. Supp. 2d 76, 84 ("Because the Secretary failed to follow either [notice and comment or good cause exception], the 2006 rule is invalid and . . . must be vacated").

## FIRST CAUSE OF ACTION

**(Violation of the APA – Unlawful Repeal of the Trump Final Rule Without Notice and Comment)**

81.     Plaintiff incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

82.     The Trump Final Rule constituted a final agency action and was duly issued, prescribed, or promulgated by DOL under the APA and the INA.  *See Humane Society,* 41 F.4th at 570 ("If an agency can prescribe a rule without publishing it, then publication cannot mark the point at which the requirement to undertake notice and comment before repeal attaches.").

83.     In requesting that OFR withhold the Final Rule from Federal Register publication and subsequently refusing to enforce its requirements, DOL, ETA, and WHD, have unlawfully repealed the Trump Final Rule in violation of the APA's requirements for due process, including a notice proposing such repeal, with a reasoned explanation for its basis and the opportunity for public comment.  *See* 5 U.S.C. § 553.

84.     DOL, ETA, and WHD's repeal of the Trump Final Rule was an "agency action" that was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," *id.* § 706(2)(A), and was "without observance of procedure required by law," *id.* § 706(2)(D).

## SECOND CAUSE OF ACTION

### (Violation of the APA – Unlawful Change in Agency Position Without Reasoned Explanation)

85.     Plaintiff incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

86.     The Trump Final Rule reflected the culmination of the rulemaking process, including "consideration" of the "written data, views, or arguments" of interested persons and "a concise general statement of [the Trump Final Rule's] basis and purpose."  *See id.* § 553(c).

87.     DOL, ETA, and WHD concluded in the Trump Final Rule that the H-2A Regulations needed to be modified to continue the INA's statutory mandate to provide farmers, ranchers, and FLCs an adequate labor supply when there is a lack of willing and able United States workers available at the time and place of need.

88.     By requesting that OFR not publish the Trump Final Rule and then subsequently refusing to enforce its requirements, DOL, ETA, and WHD have unlawfully repealed the Trump Final Rule without providing any reasoned explanation for their change in position. DOL, ETA, and WHD's actions resulted in reversal of the legal, policy and factual findings that necessitated the adoption of the Trump Final Rule, without any reasoned explanation to support that reversal.   Such actions, therefore, are "agency action" that are fundamentally and without question "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law," *id.* § 706(2)(A), and "without observance of procedure required by law," *id.* § 706(2)(D).

## THIRD CAUSE OF ACTION

### (Violation of the FRA and APA – Allowing Withdrawal of a Duly-Issued, Prescribed or Promulgated Final Rule for a Reason other than Error Correction and Failing to Publish the Trump Final Rule in the Federal Register in Accordance with OFR's Regulations)

89.     Plaintiff incorporates by reference the allegations contained in the preceding

paragraphs as if fully set forth herein.

90.     By failing to publish the Trump Final Rule after it was sent to OFR for posting

on public inspection and publication for a reason other than error-correction, OFR exceeded its

statutory authority under the FRA and its own regulations.

91.     By accepting the withdrawal of the Trump Final Rule on a Federal holiday, OFR

violated its own regulations.

92.     OFR's failure to publish the Trump Final Rule was "arbitrary, capricious, an

abuse of discretion, or otherwise not in accordance with [the FRA, 44 U.S.C. §§ 1501–10, and

associated regulations, 1 C.F.R. Parts 17 and 18]," *id.* § 706(2)(A), and was "without

observance of procedure required by [the FRA, 44 U.S.C. §§ 1501–10, and associated

regulations, 1 C.F.R. Parts 17 and 18]," *id.* § 706(2)(D).

## FOURTH CAUSE OF ACTION

### (Violation of the APA – Failure to Provide a Reasoned Explanation Based on the Administrative Record for Increasing the Surety Bond Face Value)

93.     Plaintiff incorporates by reference the allegations contained in the preceding

paragraphs as if fully set forth herein.

94.     DOL has historically not needed to "call" upon an FLC's surety bond to pay back

wages.

95.     DOL has provided no evidence in a lawful rulemaking that when it has "called"

on a surety bond during an enforcement action that bond has been insufficient to cover back

wages owed.

96.     DOL's surety bond increase scheme is not supported by facts or evidence that

DOL needs to increase the required surety bonds and therefore is "arbitrary, capricious, an abuse

of discretion or otherwise not in accordance with law." *See* 5 U.S.C. § 706(2)(A).

## FIFTH CAUSE OF ACTION

**(The Department of Labor Is Acting in Violation of 8 U.S.C. § 1101(a)(15)(H)(ii)(a), 1184(c)(1), and 1188 with regard to the increased surety bond scheme)**

97.     Plaintiff incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

98.     DOL's surety bond increase scheme will cause surety companies to leave the market, making it difficult or impossible for H-2A FLCs to obtain a required surety bond to file in compliance with the H-2A Program.

99.     The DOL surety bond increase scheme is punitive and is designed to preclude a necessary user of this Congressionally mandated program.  It is accordingly in excess of statutory jurisdiction, authority, limitations, and short of statutory right.  *Id.* § 706(2)(C).

## SIXTH CAUSE OF ACTION

**(Violation of the APA – Failure to Provide a Reasoned Explanation Based on the Administrative Record for Decreasing the Validity Standard for Approval of a Prevailing Wage Survey)**

100.    Plaintiff incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

101.    For nearly two decades DOL followed informal guidance in approving prevailing wage surveys conducted by State Workforce Agencies.  The relaxation of the prevailing wage survey requirements is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *Id.* § 706(2)(A).

102.    The relaxation of the prevailing wage survey requirements is not supported by facts or evidence. There is no evidence that these relaxed requirements will produce more statistically valid prevailing wage surveys and they will in fact produce more statistically invalid surveys.  DOL's decision therefore is fundamentally "arbitrary, capricious, an abuse of

discretion or otherwise not in accordance with law." *See id.*

## PRAYER FOR RELIEF

**WHEREFORE, Plaintiff prays that this Court:**

1.      Declare that Defendants DOL, ETA, and WHD's withdrawal of the Trump Final Rule without a reasoned explanation, notice or an opportunity for public comment violated the APA and INA;

2.      Declare that the Biden Final Rule is:

    a.   An action not in accordance with law, in violation of the APA, 5 U.S.C. §§ 701–706.

    b.   An action promulgated without observance of procedure required by law, in violation of the APA, 5 U.S.C. §§ 701–706.

    c.   An arbitrary and capricious action, in violation of the APA, 5 U.S.C. §§ 701–706;

3.      Vacate and set aside the Biden Final Rule;

4.      Stay the implementation date of the Biden Final Rule pending final judgment pursuant to 5 U.S.C. § 705;

5.      Grant a preliminary injunction and permanent injunction proscribing the Biden Final Rule from being implemented and enforced;

6.      Declare that OFR's failure to follow its own regulations by failing to publish the Trump Final Rule and permitting DOL, ETA, and WHD to withdraw it on a Federal holiday was an abuse of its discretion or exceeded its statutory authority;

7.      Award Plaintiff its costs and expenses, including reasonable attorneys' fees whether under the Equal Access to Justice Act, 28 U.S.C. § 2412, or otherwise; and

8.      Award such further and additional relief as is just and proper.


                                            Respectfully submitted,

Dated: November 23, 2022                    **s/ David R. Dorey**
                                            David R. Dorey
                                            D.C. Bar No. 1015586
                                            902 11th Street, NE
                                            Washington, DC 20002
                                            Phone: (202) 848-3406
                                            Email: david.r.dorey@gmail.com

                                            Shawn M. Packer*
                                            JPH LAW FIRM
                                            525 9th Street, NW, Suite 800
                                            Washington, DC 20004
                                            Phone: (202) 629-9310
                                            Email: spacker@jphlawfirm.com

                                            *Attorneys for Plaintiff*

                                            *motion for *pro hac vice* to be filed