**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

THE NATIONAL COUNCIL OF                :
AGRICULTURAL EMPLOYERS,                :
                                       :        Civil Action No.:        22-3569 (RC)
         Plaintiff,                    :
                                       :        Re Document No.:        12
         v.                            :
                                       :
UNITED STATES DEPARTMENT               :
OF LABOR, *et al.*,                    :
                                       :
         Defendants.                   :

**<u>MEMORANDUM OPINION</u>**

**Denying Plaintiff's Renewed Motion for Preliminary Injunction**

## I. INTRODUCTION

The National Council of Agricultural Employers ("NCAE" or "Plaintiff") seeks relief

from alleged violations of the Administrative Procedure Act ("APA") in connection with the

promulgation of a Department of Labor ("DOL") rule.[1]  Plaintiff filed the Complaint on

November 23, 2022, *see* ECF No. 1, followed two days later by a Motion for Temporary

Restraining Order and Preliminary Injunction, *see* ECF No. 4.  After an expedited hearing on

November 29, 2022, the Court denied the motion but gave Plaintiff leave to renew its motion for

preliminary injunction.  *See* Hearing Tr. at 12, ECF No. 10.  Plaintiff did so on December 23,

---

[1] In addition to DOL, Plaintiff names as defendants the Employment and Training
Administration of DOL; the Wage and Hour Division of DOL; the Office of the Federal
Register; Marty Walsh, in his official capacity as Secretary of Labor; Oliver Potts, in his official
capacity as Director of the Office of the Federal Register; Brent Parton, in his official capacity as
Principal Deputy Assistant Secretary of the Employment and Training Administration; and
Jessica Looman, in her official capacity as Principal Deputy Administrator of the Wage and
Hour Division (collectively, "Defendants").

2022, *see* ECF No. 12, and that renewed motion is now ripe for consideration.  For the reasons

set forth below, the Court denies Plaintiff's Renewed Motion for Preliminary Injunction.

## II.  FACTUAL BACKGROUND

The Immigration and Nationality Act provides for temporary work authorization for

foreign agricultural workers under the H-2A program.  *See* 8 U.S.C. § 1101(a)(15)(H)(ii)(a); §

1184(c)(1).  The H-2A program permits employers, referred to as labor contractors, to

temporarily hire foreign workers upon a certification that "there are not sufficient workers who

are able, willing, and qualified, and who will be available at the time and place needed, to

perform the [relevant] labor or services" and that "the employment of the alien in such labor or

services will not adversely affect the wages and working conditions of workers in the United

States similarly employed."  § 1188(a)(1)(A)–(B).  Once DOL certifies an employer's petition,

the employer can petition the Department of Homeland Security to designate foreign workers as

H-2A workers.  *See Overdevest Nurseries v. Walsh*, 2 F.4th 977, 980 (D.C. Cir. 2021).  NCAE

represents agricultural labor employers, including a large number of H-2A labor contractors.  *See*

Compl. ¶ 13, ECF No. 1.

### A.  2021 Rule

Congress directed the Secretary of Labor to promulgate regulations to "set the parameters

of the [H-2A] program."  *Overdevest Nurseries*, 2 F.4th at 980; 8 U.S.C. § 1101(a)(15)(H).

Those regulations appear at 20 C.F.R. pts. 653, 655 and 29 C.F.R. pt. 501.  Most of them were in

place since 2010 (the "2010 status quo") until DOL issued a notice of proposed rulemaking on

July 26, 2019 (the "2019 NPRM").  *See* Temporary Agricultural Employment of H-2A

Nonimmigrants in the United States, 87 Fed. Reg. 61660, 61662 (Oct. 12, 2022) ("The majority

of the Department's current regulations governing the H-2A program were published in 2010.");

Temporary Agricultural Employment of H-2A Nonimmigrants in the United States, 84 Fed. Reg. 36168 (proposed July 26, 2019) (to be codified at 29 C.F.R. pts. 635, 655); Compl. ¶ 44.  DOL received more than 83,000 comments on the 2019 NPRM during a 60-day notice-and-comment period, including a 27-page comment from NCAE.  *See* Compl. ¶ 44; Am. Decl. of Michael Marsh ("Am. Marsh Decl."), Ex. 1 to Renewed Mot. Prelim. Inj. ¶¶ 9–10, ECF No. 12-2; Nat'l Council of Agric. Employers, Marsh, Michael, Comment Letter on Proposed Rule Regarding Temporary Agricultural Employment of H-2A Nonimmigrants in the United States (Sept. 24, 2019), https://www.regulations.gov/comment/ETA-2019-0007-0354 [hereinafter "NCAE 2019 NPRM Comment"].

After President Biden won the 2020 election but before he took office, DOL took steps toward promulgating a final rule, which the Court will refer to as the 2021 Rule.[2]  On January 14, 2021, the then-Deputy Chief of Staff of the U.S. Department of Agriculture sent a message to stakeholders from the DOL Office of Public Liaison noticing a stakeholder call the following day "regarding significant rulemaking on the H-2A Visa Program."  Compl ¶ 46; Ex. C to Compl., ECF No. 1-3.  The next day, on January 15, 2021, DOL issued a news release announcing a "final rule that modernizes" the H-2A program, linking to a version of the rule, and stating that DOL "will publish the final rule in the Federal Register at a later date."  Compl. ¶ 47; Ex. B to Compl., ECF No. 1-2.  The linked version of the rule contained a disclaimer at the top of each page stating that the "regulation has been submitted to the Office of the Federal Register (OFR) for publication," but that "[t]his version of the regulation may vary slightly from the published

---

[2] The shorthand names "2021 Rule" and "2022 Rule" are used in this opinion strictly for convenience and should be interpreted as fully consistent with the Court's substantive analysis of the finality of those rules for purposes of the APA.

document" and "[o]nly the version published in the Federal Register is the official regulation." *Id.* (follow hyperlink embedded in words "This rule" in the third paragraph) (last visited Feb. 15, 2023).  The same day, USDA also issued a press release "applauding [DOL's] final rule modernizing the H-2A visa program,"  Ex. F to Compl., ECF No. 1-6.  Also on January 15, Plaintiff received word of the 2021 Rule and sent a message alerting its members about it.  Am. Marsh Decl. ¶¶ 15–16.

## B.  2022 Rule

On January 20, 2021, the day President Biden took office, DOL posted an announcement to its website stating that it "withdrew" the "forthcoming final rule" that had been announced on January 15 "prior to its publication for the purpose of reviewing issues of law, fact, and policy raised by the rule."  Ex. D to Compl., ECF No. 1-4.  It explained that "it will not take effect" and that DOL would "notify the public of any further actions as appropriate once it completes its review."  *Id.*  Fast-forwarding about 18 months, as of July 15, 2022, Michael Marsh, President and CEO of NCAE, alleges that he was aware that DOL had sent an updated draft final rule to the Office of Information and Regulatory Affairs at the Office of Management and Budget.  Am. Marsh Decl. ¶ 21.  On August 11, 2022, Plaintiff participated in a telephonic meeting regarding that draft rule with DOL staff, although allegedly no staff from the principally relevant DOL components—the Employment and Training Administration ("ETA") and the Wage and Hour Division ("WHD")—were present.  *Id.* ¶ 23.

On October 6, 2022, DOL published an announcement on its website stating that a final version of the rule was to be published in the Federal Register on October 12, 2022.  Compl. ¶ 63.  On October 12, 2022, the rule (the "2022 Rule") was published in the Federal Register, with an effective date of November 14, 2022.  *Id.* ¶ 64; Temporary Agricultural Employment of H-2A

Nonimmigrants in the United States, 87 Fed. Reg. 61660 (Oct. 12, 2022) (to be codified at 20

C.F.R. pts. 635, 655).  Based on a transition period provided for under the rule, in conjunction

with program application timing requirements, Plaintiff states that December 15, 2022 was the

first date that an employer's application was processed under the 2022 Rule.  *See* Mem. Supp.

Pl.'s Renewed Mot. Prelim. Inj. ("Renewed Mot. PI") at 6, ECF No. 12-1.[3]

### III.  LEGAL STANDARD

For a preliminary injunction to issue, "the moving party must demonstrate (1) a

substantial likelihood of success on the merits, (2) that it would suffer irreparable harm without

injunctive relief, (3) that an injunction would not substantially harm other interested parties, and

(4) that issuance of the injunction is in the public interest." *Cobell v. Norton*, 391 F.3d 251, 258

(D.C. Cir. 2004).  The first two factors are most important, and a court "may deny a motion for

preliminary injunction, without further inquiry, upon finding that a plaintiff is unable to show

<u>either</u> irreparable injury or a likelihood of success on the merits." *Standing Rock Sioux Tribe v.*

*U.S. Army Corps of Eng'rs*, 205 F. Supp. 3d 4, 26 (D.D.C. 2016) (emphasis in original).  To

show irreparable harm in the D.C. Circuit, the movant must demonstrate an injury that is "both

certain and great ... of such imminence that there is a clear and present need for equitable relief

to prevent irreparable harm" and that the injury be "beyond remediation."  *Chaplaincy of Full*

*Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (cleaned up).  The harm must

be "'more than simply irretrievable; it must also be serious in terms of its effect on the

plaintiff.'"  *Hi–Tech Pharmacal Co. v. FDA*, 587 F. Supp. 2d 1, 11 (D.D.C. 2008) (quoting *Gulf*

*Oil Corp. v. Dep't of Energy*, 514 F. Supp. 1019, 1026 (D.D.C.1981)).  That is, the "alleged

---

[3] Plaintiff previously stated that date as November 30, 2022, *see* Compl. ¶ 66, but the discrepancy is immaterial to consideration of the present motion.

injury must be certain, great, actual, and imminent." *Hi–Tech Pharmacal Co.*, 587 F. Supp. 2d at 11 (citing *Wis. Gas. Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)).  Accordingly, "[t]he irreparable injury requirement erects a very high bar for a movant."  *Coalition for Common Sense in Gov't Procurement v. United States*, 576 F. Supp. 2d 162, 168 (D.D.C. 2008) (citing *Varicon Int'l v. OPM*, 934 F. Supp. 440, 447 (D.D.C. 1996)).

"[I]n this Circuit, the general rule is that 'economic loss does not, in and of itself, constitute irreparable harm'" because economic harm usually is recoverable in monetary damages.  *Xiami Corp. v. Dep't of Def.*, 2021 WL 950144, at *10 (D.D.C. 2021) (quoting *Wis. Gas. Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)).  However, where, as here, sovereign immunity precludes a monetary award, "courts have recognized that unrecoverable economic loss can indeed constitute irreparable harm." *Id.* (citations omitted).  Still, it would "eviscerate the irreparable harm requirement" to hold that any damage caused by a government defendant is necessarily irreparable harm for purposes of the preliminary injunction standard.  *Id.* (citing *Air Trans. Ass'n of Am. v. Export-Import Bank of the U.S.*, 840 F. Supp. 2d 327, 335 (D.D.C. 2012)).  Accordingly, "economic harm must be significant, even where it is irretrievable because a defendant has sovereign immunity."  *Air Trans.*, 840 F. Supp. 2d at 335.  Economic harm is significant where "a movant makes a strong showing that the economic loss would significantly damage its business above and beyond a simple diminution in profits," for example when "the loss threatens the very existence of the movant's business." *Id.* at 336 (cleaned up).

At all times, courts must bear in mind that a "preliminary injunction is an extraordinary remedy that should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion."  *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)).  In addition, "[m]andatory injunctions that 'would

change the status quo' are disfavored as 'an even more extraordinary remedy' than the typical preliminary injunction, 'especially when directed at the United States Government.'" *Strait Shipbrokers Pte Ltd. v. Blinken*, 560 F. Supp. 3d 81, 92–93 (D.D.C. 2021) (quoting *Abdullah v. Bush*, 945 F. Supp. 2d, 64, 67 (D.D.C. 2013) and then *Sierra Club v. Johnson*, 374 F. Supp. 2d 30, 33 (D.D.C. 2005)); *see also Sherley v. Sebelius*, 689 F.3d 776, 781–82 (D.C. Cir. 2012) (explaining that a preliminary injunction is "a stopgap measure, generally limited as to time, and intended to maintain a status quo or to preserve the relative positions of the parties until a trial on the merits can be held" (quotation omitted)).

## IV.  ANALYSIS

Plaintiff pursues two related claims from the Complaint in its present motion.  First, Plaintiff claims that DOL unlawfully withdrew the 2021 Rule without observing the notice-and-comment procedures required under the APA.  Renewed Mot. PI at 8–14.  Second, Plaintiff claims that DOL unlawfully promulgated the 2022 Rule without observing those procedures.[4] *Id.* at 14.  The Court addresses each claim in turn.

### A.  Unlawful Withdrawal of 2021 Rule

Plaintiff claims that the 2021 Rule was a final rule for purposes of the APA, and therefore that DOL violated the APA's procedural requirements when it failed to provide notice and an opportunity to comment before withdrawing it.  *See* Renewed Mot. PI at 7–14.  The APA requires agencies to provide "[g]eneral notice of proposed rulemaking" through "public[ation] in

---

[4] The introduction section to Plaintiff's motion briefly references an additional claim from the Complaint that the 2022 Rule is arbitrary and capricious under the APA, but Plaintiff does not address this claim in the body of its motion or make any argument that this alleged violation warrants a preliminary injunction.  This falls far short of Plaintiff's burden to establish its likelihood of success on the merits as to this claim by a "clear showing."  *Cobell*, 391 F.3d at 258.

the Federal Register" and to "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." 5 U.S.C. § 553(c). The APA defines "rule making" as an "agency process for formulating, amending, or repealing a rule" and defines a "rule" as "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." 5 U.S.C. § 551(4)–(5). "Thus, once an agency makes a rule—that is, once it makes a statement prescribing law with future effect—the APA requires the agency to provide notice and an opportunity for comment before repealing it." *Humane Soc'y of the United States v. United States Dep't of Agric. ("Humane Soc'y")*, 41 F.4th 564, 569 (D.C. Cir. 2022).

It has become common practice for "incoming presidential administrations [to] quietly withdraw[] rules awaiting Federal Register publication without observing [notice-and-comment]." *Humane Soc'y*, 41 F.4th at 568. Plaintiff alleges that DOL's withdrawal of the 2021 Rule when President Biden assumed office was unlawful because the 2021 Rule had become final for purposes of the APA, such that new notice-and-comment was required before its recission. *See* Renewed Mot. PI at 7–14. While the Court considers this argument as it relates to Plaintiff's related claim that the 2022 Rule was unlawfully promulgated, *see infra* Section IV.B.3, it does not reach the merits of Plaintiff's direct challenge to the withdrawal of the 2021 Rule because it finds that Plaintiff lacks standing as to that claim.

Standing is "an essential and unchanging part of the case-or-controversy requirement of Article III," *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992), and therefore is "a necessary 'predicate to any exercise of [Article III courts'] jurisdiction,'" *Dominguez v. UAL Corp.*, 666 F.3d 1359, 1361 (D.D.C. 2012) (quoting *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 663 (D.C. Cir. 1996) (en banc)). Accordingly, "[e]very plaintiff in federal court bears the burden of

establishing the three elements that make up the irreducible constitutional minimum of Article III standing: injury-in-fact, causation, and redressability." *Id.* at 1362 (internal citation omitted). Standing is "not dispensed in gross;" rather, Plaintiffs must show standing as to each claim. *Davis v. FEC*, 554 U.S. 724, 734 (2008) (internal quotation omitted).

There are two ways Plaintiff can establish standing: "on its own behalf, as an organization, or on behalf of its members, as associational standing." *Elec. Privacy Info. Ctr. v. United States Dep't of Com.*, 928 F.3d 95, 100 (D.C. Cir. 2019). Here, Plaintiff asserts associational standing, *see* Pl.'s Reply Supp. Renewed Mot. PI ("Pl.'s Reply") at 2–3, ECF No. 15, which requires a showing that "(1) at least one of [its] members has standing to sue in her or his own right, (2) the interests the association seeks to protect are germane to its purpose, and (3) neither the claim asserted nor the relief requested requires the participation of an individual member in the lawsuit." *Elec. Privacy Info. Ctr.*, 928 F.3d at 101 (internal quotation omitted). It is Plaintiff's burden to "support each element of [its] claim to standing by affidavit or other evidence." *Am. Chemistry Council v. Dep't of Transp.*, 468 F.3d 810, 818 (D.C. Cir. 2006) (internal citation omitted).

Plaintiff fails to establish that any of its members suffered an injury in fact from the withdrawal of the 2021 Rule. While Plaintiff alleges that its members suffered economic harm from implementation of the 2022 Rule, principally in the form of its revised surety bond requirements,[5] it does not allege any similar economic harm from withdrawal of the 2021 Rule.

---

[5] Generally, an H-2A labor contractor must submit with its application "proof of its ability to discharge its financial obligations in the form of a surety bond." 84 Fed. Reg. 36203. This bonding requirement, which was implemented in 2009, "allows [DOL] to ensure that labor contractors, who may be transient and undercapitalized, can meet their payroll and other program obligations, thereby preventing program abuse." *Id.* Both the 2021 Rule and 2022 Rule included changes that generally increased the required face-value of qualifying surety bonds. *See* Defs.' Opp'n at 8–10.

*See* Pl.'s Reply at 2–4 (explaining that Plaintiff did not "feel harmed by the illegal withdrawal of the [2021 Rule]," until the Biden Administration later proposed the 2022 Rule and stating that reversion to the 2010 status quo "would have been just fine with Plaintiff.").  As Defendants point out, and Plaintiff does not contest, "according to Plaintiff's own declarations, Plaintiff's members were *better off* for the nearly two years between the withdrawal of the 2021 Draft Final Rule and the promulgation of the 2022 Final Rule because the increased surety bond requirements of which Plaintiff complains would have applied much earlier."  Defs.' Opp'n at 12, ECF No. 13; *see also* Am. Marsh Decl. ¶¶ 27–29 (alleging losses to NCAE members from increased surety bond costs caused by implementation of the 2022 Rule as compared to the status quo under the 2010 rule, but alleging no injury from withdrawal of the 2021 Rule).  Indeed, Plaintiff submitted a comment to DOL critical of the 2021 Rule's revisions to the H-2A program's surety bond requirements that were "almost identical" to those it objects to in the 2022 Rule.  Defs.' Opp'n at 17; *see* NCAE 2019 NPRM Comment at 21–22.[6]

Plaintiff's motion refers to a possible procedural injury from the withdrawal of the 2021 Rule, arguing that the lack of separate notice-and-comment deprived it of the opportunity to submit a comment highlighting certain benefits of the 2021 Rule before its withdrawal. Renewed Mot. PI at 13–14.  However, faced with Defendants' lengthy argument that the lack of separate notice-and-comment did not cause injury to any of Plaintiff's concrete interests, *see* Defs.' Opp'n at 13–19,[7] Plaintiff's reply appears to retract any claim of procedural injury from

---

[6] For the same reasons, Plaintiff also would have failed to establish irreparable harm from the withdrawal of the 2021 Rule and therefore would not have been entitled to a preliminary injunction on this claim even if the Court found that it had standing to pursue it.

[7] "A procedural injury claim . . . must be tethered to some concrete interest adversely affected by the procedural deprivation . . . ."  *WildEarth Guardians v. Jewell*, 738 F.3d 298, 305 (D.C. Cir. 2013).

the withdrawal of the 2021 Rule, s*ee* Pl.'s Reply at 3 (explaining, in section titled "Standing," that "the procedural right being challenged here is the unlawful promulgation of the [2022 Rule] without allowing Plaintiff or its membership to comment on that rulemaking and the subsequent increase in costs Plaintiff's membership must now bear to participate in the H-2A program."). There is therefore no basis on which to find that any NCAE member suffered an injury in fact from the withdrawal of the 2021 Rule. *See Ctr. for Law and Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1157 (D.C. Cir. 2005) ("Where plaintiffs allege injury resulting from violation of a *procedural* right afforded to them by statute and designed to protect their threatened concrete interest, the courts relax—while not wholly eliminating—the issues of imminence and redressability, *but not the issues of injury in fact or causation*." (second emphasis added)). Accordingly, the Court lacks jurisdiction to consider Plaintiff's independent claim that the 2021 Rule was unlawfully withdrawn.

## B.  Unlawful Promulgation of 2022 Rule

### 1.  Standing

In an effort to argue that Plaintiff also lacks standing as to its claim that the 2022 Rule was unlawfully promulgated, Defendants attempt to collapse that claim into Plaintiff's claim that the 2021 Rule was unlawfully withdrawn. *See* Defs.' Opp'n at 12 ("Plaintiff's [motion] presses just one overarching merits argument: that DOL's withdrawal of the 2021 Draft Final Rule from OFR prior to the document being made available for public inspection was unlawful because DOL did not first seek public comment."). From there, Defendants argue that Plaintiff's allegations of economic harm to NCAE members caused by the 2022 Rule are irrelevant because the calculations compare conditions under the 2010 status quo and the 2022 Rule, not under the 2021 Rule and the 2022 Rule. *See Id.* ("While Plaintiff has supplemented its initial motion with

additional declarations, none of them assert that any member has been harmed by the 2022 Final Rule vis-à-vis the 2021 Draft Final Rule."); *see also id.* at 17 (arguing that Plaintiff's comparisons "between the surety bond requirements of the 2010 rule and the 2022 Final Rule[] do not establish that any NCAE member has suffered an Article III injury caused by the procedural claim pressed in this motion, which is that the 2021 Draft Final Rule was unlawfully withdrawn.").

The Court disagrees.  While the question of whether the 2021 Rule was unlawfully withdrawn bears on whether the 2022 Rule was unlawfully promulgated, *see infra* Section IV.B.3, Plaintiff has maintained them as distinct claims from the beginning.  *See* Compl. at 20–24 (listing separate causes of action and seeking separate relief for each claim); Pl.'s Mem. Supp. Mot. Temp. Restraining Order and Prelim. Inj. at 7–8, ECF No. 4 (claiming that Defendants "failed to properly repeal" the 2021 Rule and "*also* did not produce the [2022] Rule through notice and comment"); Renewed Mot. PI at 7–8 (same).  That Plaintiff has chosen to link the merits of its claim that the 2022 Rule was unlawfully promulgated to an argument that the 2021 Rule was unlawfully withdrawn does not require Plaintiff to prove that it would have suffered an injury from promulgation of the 2022 Rule in the hypothetical world where the 2021 Rule was the ex-ante status quo.  To the contrary, the Article III standing requires a concrete injury.  *See Spokeo v. Robins*, 578 U.S. 330, 340 (2016) ("A concrete injury must be *de facto*; that is, it must actually exist." (internal quotation omitted)).  Accordingly, the relevant point of comparison for assessing Plaintiff's injury is the 2010 status quo, which remained in place until promulgation of the 2022 Rule.

Plaintiff alleges that NCAE and its members were injured by the deprivation of its "procedural right" to notice and the opportunity to comment on the 2022 Rule.  Renewed Mot. PI

at 15 ("New notice and comment procedures were required to promulgate a rule that was not the [2021 Rule]."); *see* Pl.'s Reply at 2–3 ("The procedural right being challenged here is the unlawful promulgation of the [2022 Rule] without allowing Plaintiff or its membership to comment on that rulemaking and the subsequent increase in costs Plaintiff's membership must now bear to participate in the H-2A program.").  To establish this procedural injury as a valid basis for standing, Plaintiff does not need to show that DOL would have taken a different course if Plaintiff had been able to comment on the 2022 Rule, but does need to show "some concrete interest adversely affected by the procedural deprivation." *WildEarth Guardians v. Jewell*, 738 F.3d 298, 305 (D.C. Cir. 2013); *see Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6, 15–16 (D.C. Cir. 2011) (explaining that "standing may exist even if the right to comment likely would not have succeeded in persuading the agency to change its mind" but that "'the requirement of injury in fact is a hard floor of Article III standing that cannot be removed by statute'" (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 497 (2009)).

Plaintiff has demonstrated that its members' concrete interests were adversely affected by the procedural injury alleged here.  An amended declaration submitted by NCAE's President and CEO, Michael Marsh, states that revisions to the H-2A program's surety bond requirements included in the 2022 Rule will increase the compliance costs faced by NCAE member Fresh Harvest by $602,575 in 2023.  Am. Marsh Decl. ¶ 27.  Another NCAE member, Everglades Harvesting, saw its compliance costs increase by approximately $3,000 for a contract under the 2022 Rule with a start-date in February 2023.  That NCAE members' concrete interests are affected by the 2022 Rule is corroborated by the fact that, as Defendants emphasize, the 2019 NPRM would have "called for almost identical increases in surety bond amounts and premiums as those required by the [2022 Rule]," Defs.' Opp'n at 17, and Plaintiff submitted a comment on

the 2019 NPRM criticizing that policy change, *see* NCAE 2019 NPRM Comment at 21–22. Because it is also clear that the NCAE members' alleged losses are caused by the 2022 Rule, and would be redressable by its vacatur, the Court finds that NCAE has demonstrated that at least one of its members would have standing to sue in its own right.  As to the other elements of associational standing, the Court has no trouble finding that advocacy concerning significant changes to the H-2A program is germane to NCAE's purpose as a "national trade association focusing on agricultural labor issues from the agricultural employer's viewpoint," including by concentrating on "the H-2A temporary agricultural guestworker visa program and how it helps farmers and ranchers to find the legal agricultural labor they need to feed the United States." Am. Marsh Decl. ¶ 3.  And this suit does not require the participation of any individual member. *See United Food and Com. Workers Union Local 751 v. Brown Grp.*, 517 U.S. 544, 544, 554 (1996) (explaining that, generally, association standing is inappropriate "when an organization seeks damages on behalf of its members" but not when it seeks injunctive or declaratory relief). Accordingly, Plaintiff has established associational standing to pursue its claim that DOL unlawfully promulgated the 2022 Rule.

## 2.  Irreparable Harm

While Plaintiff has shown that its members' concrete interests are adversely impacted by the alleged procedural injury, it has not done enough to clear the much higher bar of demonstrating irreparable harm for purposes of obtaining a preliminary injunction.  *See Cal. Ass'n of Priv. Postsecondary Schs. v. DeVos*, 344 F. Supp. 3d 158, 170 (D.D.C. 2018) ("A prospective injury that is sufficient to establish standing . . . does not necessarily satisfy the more demanding burden of demonstrating irreparable injury.").  As explained above, the "general rule" in this Circuit is that "economic harm does not constitute irreparable injury."  *Davis v.*

*Pension Benefits Guar. Corp.*, 571 F.3d 1288, 1295 (D.C. Cir. 2009).  While courts may depart

from this general rule where, as here, the economic loss is unrecoverable, unrecoverable

economic loss still must be "great, certain and imminent." *Alcresta Therapeutics v. Azar*, 318 F.

Supp. 3d 321, 327 (D.D.C. 2018) (quotation omitted).  That is, the Court must find that that the

"monetary loss . . . threatens the very existence of the movant's business," *Cardinal Health v.*

*Holder*, 846 F. Supp. 2d 203, 211 (D.D.C. 2012) (quoting *Wisc. Gas Co. v. FERC*, 785 F.2d 669,

674 (D.C. Cir. 1985)), or at least that it is "serious in terms of its effect on the plaintiff," *Mylan*

*Pharm. v. Shalala*, 81 F. Supp. 2d 30, 42 (D.D.C. 2000) (internal quotation omitted) ; *see also*

*Cal. Ass'n of Priv. Postsecondary Schs.*, 344 F. Supp. 3d at 171 ("Even where the United States

is the defendant, a plaintiff must establish that the economic harm is so severe as to cause

extreme hardship to the business" (internal quotation omitted)).  This inquiry requires placing the

alleged economic loss "in the context of [the movant's] overall financial health." *Alcresta*

*Therapeutics*, 318 F. Supp. 3d at 327.

    Plaintiff provides loss estimates for three of its members, but fails to provide any

information placing the alleged losses in the context of the companies' overall finances.[8]  This is

---

[8] Plaintiff also makes certain generalized allegations about possible effects on the H-2A labor contractor industry overall.  *See, e.g.*, Renewed Mot. PI 20–21 (alleging that "the unlawfully promulgated [2022 Rule] will harm the H-2A agricultural employers in all states but especially those in Washington State" because it will "cause less accurate prevailing wages and higher wage inflation in states that conduct prevailing wage surveys," but making no attempt to quantify any loss to a specific NCAE member beyond citation to an industry-wide economic analysis).  This is too vague and speculative to meet the "demanding burden of demonstrating irreparable injury." *Cal. Ass'n of Priv. Postsecondary Schs.*, 344 F. Supp. 3d at 170; *see id* at 171 ("The standard also requires more than conclusory assertions of potential loss. . . .  [T]he movant bears the burden of presenting specific details regarding the extent to which [its] business will suffer." (cleaned up)); *Save Jobs USA v. U.S. Dep't of Homeland Sec.*, 105 F. Supp. 3d 108, 115 (D.D.C. 2015) ("For economic harm to constitute irreparable injury . . . [the movant] must adequately describe and quantity the level of harm its members face." (internal quotation omitted)).

despite Defendants' direct challenge on this point in their opposition.  *See* Defs.' Opp'n at 22–23.  As noted above, Plaintiff alleges that NCAE member Fresh Harvest will face $602,575 in compliance costs in 2023 due to the 2022 Rule's surety bond provisions.  *See* Renewed Mot. PI at 19; Am. Marsh Decl. ¶ 27.  Plaintiff also alleges that NCAE member Everglade Harvesting faces $2,891 in increased compliance costs for a contract with a start date in February 2023.  *See* Renewed Mot. PI at 20; Am. Marsh Decl. ¶ 29.  Yet, even after Defendant calls into question the significance of these alleged losses in relation to the overall financial situation of the companies, Plaintiff makes no attempt to put their alleged losses in context in its reply brief.  *See* Pl.'s Reply at 5 (arguing in conclusory fashion that NCAE members' losses are "significant" without reference to Fresh Harvest or Everglade Harvesting).  Much greater losses have been held insufficient to establish irreparable harm because they were not significant in relation to the movant's business.  *See, e.g.*, *Alcresta Therapeutics*, 318 F. Supp. 3d at 327 (finding no irreparable harm in alleged $15 million loss because the plaintiff "declined to place its alleged lost profits in the context of its overall financial health"); *Cardinal Health*, 846 F. Supp. 2d at 212 (finding alleged loss of $1 billion insufficient in the context of movant's $102 billion revenue); *Air Transp.*, 840 F. Supp. 2d at 338 (finding that alleged $2.1 billion loss insufficient in the context of movant's $31.8 billion revenue).

Plaintiff alleges that NCAE member Insurance Office of America ("IOA"), a surety bond underwriter for H-2A labor contractors, will suffer greater losses.  Specifically, Plaintiff alleges that IOA will lose $400,000 in "direct business" in 2023 from surety bonds "that will not be written" due to the changes in the 2022 Rule, in addition to $10 million in "residual business [IOA] obtains when it is able to write surety bonds in the form of underwriting workers compensation insurance, vehicle insurance, and other insurance products."  Am. Decl. of

Kathleen Brown, Vice President of H-2A Program at IOA ("Am. Brown Decl."), Ex. 2 to

Renewed Mot. PI ¶¶ 16–17, ECF No. 12-3.[9]  Defendants argue that these alleged losses are not

significant in relation to IOA's claimed $260 million in revenue and $2.5 billion in premiums.

*See* Defs.'s Opp'n at 22 (citing to figures from IOA's website at https://www.ioausa.com/our-

story/); *accord* Am. Brown Decl. ¶ 2 (describing IOA as "the largest underwriter for H-2A Farm

Labor Contractor ('FLC') surety bonds in the United States").  Vexingly, Plaintiff replies not

with facts contextualizing IOA's alleged losses, but rather by insinuating that Defendants, bathed

in federal tax revenues, are simply out of touch.  *See* Pl.'s Reply at 5 ("Perhaps the $10,400,000

irreparable loss discussed in a declaration by just one of Plaintiff's members isn't significant

enough to Defendants with billion dollar budgets paid out of the public fisc, but surely it is to

that member.").  This falls short of the "clear showing" required to warrant extraordinary

injunctive relief.  *Cobell*, 391 F.3d at 258.

Plaintiff also throws in a one-sentence argument that the level of losses alleged by IOA

has been "held sufficient in the past by this Court," citing *Luokung Tech. Corp. v. Dep't of Def.*,

538 F. Supp. 3d 174, 192 (D.D.C. 2021) for the proposition.  But Plaintiff misreads *Luokung*.  In

that case, the movant, a publicly traded commercial technology company, sought to enjoin the

U.S. Department of Defense from enforcing its decision to designate it as a Communist Chinese

Military Company ("CCMC").  *Luokung*, 538 F. Supp. 3d at 178.  Plaintiff seems to be seizing

on the fact that that the movant in that case alleged that it had already lost "more than $10

---

[9] While the Court finds that Plaintiff has failed to allege irreparable harm even assuming the sufficiency of these allegations, it notes that the spare factual underpinning for these loss estimates provided in Ms. Brown's amended declaration also calls into question whether Plaintiff has "substantiate[d]" that these alleged losses are likely to occur.  *Wisc. Gas Co.*, 758 F.2d at 674; *see also Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 540 F. Supp. 3d 45, 56 (D.D.C. 2021) ("Bare allegations . . . are of no value; a court, rather, requires affirmative proof of likelihood and imminence." (cleaned up)).

million dollars." *Id.* at 192 (internal quotations omitted).  But this superficial comparison

overlooks the additional findings on which the Court based its irreparable harm holding.  Most

importantly, the Court found that "the magnitude of [movant's] economic injuries will expand

exponentially" three days after the Court issued its opinion, at which point "Nasdaq, the only

public trading market for [movant's] shares, has stated that it will halt all trading of [its]

securities and delist it entirely effective on this same date." *Id.* at 193.  The Court found that this

"massive restriction on liquidity will place enormous downward pressure on the share price." *Id.*

(quotations omitted).  The Court further found that "the FTSE Russell has also removed

[movant] from its stock indices" due to the CCMC designation, and that the designation would

"cut off [movant's] access to U.S. capital markets" and "negatively impact [its] ability to recruit

or retain top talent." *Id.*  Taken together, the likely economic losses were so profound that the

Court found them to be potentially "even more severe" in terms of their impact on the business

than $10 billion in losses alleged in a different case. *Id.*  Plaintiff has failed to make a similar

showing here.  As explained above, $10 million is not a magic number beyond which the

irreparable harm threshold is necessarily crossed, s*ee, e.g.*, *Air Transp.*, 840 F. Supp. 2d at 338

(finding no irreparable harm in alleged $2.1 billion in losses compared to movant's $31.8 billion

in revenue), and Plaintiff has failed to allege sufficient facts for the Court to find that any NCAE

member will suffer economic losses "so severe as to cause extreme hardship to the business,"

*Cal. Ass'n of Priv. Postsecondary Schs.*, 344 F. Supp. 3d at 171.[10]

---

[10] Plaintiff also briefly argues that its members will be irreparably harmed by "having to comply with a complex, far-reaching, costly regulatory regime that is both wholly defective and fleeting (because it will have to be set aside)."  Renewed Mot. PI at 16.  The Court is aware of no case that stands for a rule that frustration at the complexity of an already-existing regulatory program is sufficient harm to warrant extraordinary injunctive relief to prevent a rule revising the program from taking effect.  Plaintiff quotes *N. Mariana Islands v. United States*, 686 F. Supp. 2d 7 (D.D.C. 2009), in which the court explained that "concerns about fairness to affected parties

Because Plaintiff has failed to establish irreparable harm, its motion must be denied. *Alcresta Therapeutics*, 318 F. Supp. 3d at 325 ("[E]ven a strong likelihood of prevailing on the merits cannot make up for a deficient showing of irreparable injury." (quotation omitted)). However, the Court proceeds to discuss Plaintiff's likelihood of success on the merits in an effort to focus the issues for further litigation in this matter.

### 3.   Substantial Likelihood of Success

While the Court finds, for the reasons explained above, that Plaintiff lacks standing to directly challenge the withdrawal of the 2021 Rule, the question of whether that rule was final such that the APA's notice-and-comment requirement attached remains central to Plaintiff's argument that the 2022 Rule was unlawfully promulgated.  Plaintiff argues that the Federal Register Act ("FRA"), which "mandates publication of presidential proclamations and agency regulations with general applicability and legal effect" in the Federal Register, *Humane Soc'y*, 41 F.4th at 569; *see* 44 U.S.C. § 1503, supports its position that the notice-and-comment requirement attached to the 2021 Rule as of the point when NCAE received notice of its existence, *see* Renewed Mot. PI at 10 ("What counts  is notice, nothing else.").  As the D.C. Circuit explained in *Humane Soc'y*, the FRA

> requires agencies to transmit to [the Office of the Federal Register ("OFR")] the original
> and copies of any document required to be published in the Federal Register.  44 U.S.C. §

_____

and the exposure of proposed regulations to diverse public comment are especially warranted where the rule in question creates a complex and far-reaching regulatory regime." *Id.* at 17 (internal quotations omitted).  Here, the 2022 Rule amended, but did not create, the longstanding H-2A program.  Moreover, Plaintiff omits the court's explanation, just before that quote, that "to justify issuance of a preliminary injunction, the [movant] must show that unless the rule is enjoined, [it] is likely to experience not just some injury, but irreparable harm that cannot be cured by ultimate success on the merits in this case." *Id.*  Plaintiff has failed to make such a showing here.  *See Mexichem Specialty Resins v. EPA*, 787 F.3d 544, 556 (D.D.C. 2015) (finding no irreparable harm in compliance costs associated with new emissions limits in part because the "costs of measuring emissions in order to monitor compliance must be incurred under any emissions limit").

> 1503.  Under OFR's regulations, the document is then "held for confidential processing until it is filed for public inspection." 1 C.F.R. § 17.1.  Then, OFR must make a copy "immediately available for public inspection in the Office" and "cause to be noted on the original and duplicate originals or certified copies of each document the day and hour of filing."  44 U.S.C. § 1503.
>
> The Federal Register Act also sets forth the legal consequences of each step in this process. Making a document available for public inspection "is sufficient to give notice of the contents of the document to a person subject to or affected by it." 44 U.S.C. § 1507.  A document "is not valid as against a person who has not had actual knowledge of it until ... [it is] made available for public inspection."  *Id.*  Federal Register publication then "creates a rebuttable presumption" that the document was "duly issued, prescribed, or promulgated" and that it was properly "made available for public inspection at the day and hour stated in the printed notation." *Id.*

*Humane Soc'y*, 41 F.4th at 569.  On this basis, and in the context of a challenge to the withdrawal without notice-and-comment of a rule that had been made available for public inspection but not yet published in the Federal Register, the court held that "both the Federal Register Act and FOIA contemplate prepublication enforcement against parties with actual notice" of agency rules.  *Humane Soc'y*, 41 F.4th at 570.  However, the court specifically declined to opine on the question at the heart of Plaintiff's claim here: "when APA procedures attach to rules not yet on public inspection but enforceable against those with actual notice." *Id.* at 575.[11]

Plaintiff would have the Court hold that the APA's procedures attach at the moment the rule becomes enforceable against those with notice.  But a predicate question for purposes of Plaintiff's claim is: notice of what?  As noted above, the 2021 Rule posted to the DOL website on July 15, 2021 contained a disclaimer stamped at the top of each page that read, in full:

> **Disclaimer**:  This regulation has been submitted to the Office of the Federal Register (OFR) for publication, and is currently pending placement on public inspection at the OFR and publication in the Federal Register. This version of the regulation may vary slightly from the published document if minor technical or formatting changes are made

---

[11] It is undisputed that here, unlike in *Humane Soc'y*, in addition to not publishing the 2021 Rule in the Federal Register, OFR also did not make it available for public inspection.  *See* Renewed Mot. PI at 5.

during the OFR review process. Only the version published in the Federal Register is the
official regulation.

Compl. ¶ 58 (linking to https://www.dol.gov/sites/dolgov/files/ETA/oflc/pdfs/H-2A-2020-final-

rule-1_8_2021-Clean-with-disclaimer.pdf); Ex. F to Am. Marsh Decl. (linking to same).

According to DOL itself, the posted version of the 2021 Rule was subject to change.  While the

disclaimer refers to possible changes as slight "technical or formatting changes," such changes

can substantially alter the meaning and effect of a statute or regulation.  *See, e.g.*, *Facebook, v.*

*Duguid*, 141 S. Ct. 1163, 1170 (2021) (parsing the way a comma changes the meaning of a

statute).  More generally, that a rule may undergo meaningful changes between when it is sent to

OFR and when it is made available for public inspection is reinforced by the fact that OFR's

regulations envision a period of "confidential processing" before a rule is made available for

public inspection, and require an agency to file a separate request supported by explanation

where it seeks to make a rule available on an expedited "emergency" basis.  1 C.F.R. §§ 17.1,

17.2(a), 17.6.  Even rules made available for public inspection, but not yet published in the

Federal Register, "may be withdrawn from publication or corrected by the submitting agency."  §

18.13(a).

Plaintiff cites *Indus. Union Dep't v. Bingham*, 570 F.2d 965 (D.C. Cir. 1977), pointing to

the D.C. Circuit's statement that a "person with actual notice is bound by an agency action, even

if the act which imparts constructive notice to others, filing with the Federal Register for

publication, has not yet occurred."  *Id.* at 971; Renewed Mot. PI at 12.  But that case involved an

emergency temporary standard signed in the presence of the plaintiff organization by the

Assistant Secretary of Labor pursuant to specific statutory authority to do so without regard to

the requirements of the APA.  *Bingham* 570 F.2d at 967 & n.1.  That is distinct from the present

situation, in which a press release linked to a version of an ordinary agency rule containing a

disclaimer on each page stating that it was subject to change and not the "official regulation." Indeed, there is evidence that not even Plaintiff believed the 2021 Rule was an enforceable final rule. The same January 15, 2021 email that Plaintiff claims put it on notice of the 2021 Rule stated that it was "[l]ikely to be caught up in incoming administration's 60-day regulatory freeze" such that it was "[h]ighly questionable if it sees the light of day in published form." Ex. E to Am. Marsh Decl. It concluded, "[n]othing will change fast, is the bottom line." *Id.*

Accordingly, whenever the APA's notice-and-comment requirement attaches to a rule not made available for public inspection, Plaintiff has not demonstrated a substantial likelihood that it will succeed in proving that it attached to the 2021 Rule, which, by its own terms, was not the "official regulation." In turn, because Plaintiff's entire argument hinged on the Court finding that the APA's procedural requirements *did* attach to the 2021 Rule, such that DOL could no longer rely on the notice-and-comment process from the 2019 NPRM to promulgate the 2022 Rule, Plaintiff has also failed to demonstrate a substantial likelihood of success on the merits of its claim that the 2022 Rule was unlawfully promulgated.[12] Plaintiff is not entitled to a preliminary injunction.

---

[12] The Court notes that Plaintiff has made no alternative argument that separate notice-and-comment was required for the 2022 Rule under the "logical outgrowth" doctrine, under which new notice-and-comment is required "if the final rule cannot fairly be viewed as a 'logical outgrowth' of the initial proposal." *First American Discount Corp. v. Commodity Futures Trading Comm'n*, 222 F.3d 1008, 1015 (D.C. Cir. 2000) (quoting *Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 547 (D.C. Cir. 1983). "The test for a 'logical outgrowth,' variously phrased, is whether a reasonable commenter should have anticipated that such a requirement would be promulgated . . . or whether the notice was sufficient to advise interested parties that comments directed to the controverted aspect of the final rule should have been made." *Id.* (internal quotations omitted). There is ample reason to doubt whether this doctrine would apply here, given the similarity between the challenged surety bond requirements in the 2022 Rule to those included in the 2019 NPRM, *see* Defs.' Opp'n at 8–10, but it suffices for now to note that Plaintiff has not raised the argument, let alone established a substantial likelihood of success on its merits, in the present motion.

## V.  CONCLUSION

For the foregoing reasons, Plaintiff's Renewed Motion for Preliminary Injunction (ECF No. 12) is **DENIED**.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.  The parties are directed to meet and confer and submit a proposed schedule for briefing on the merits on or before March 2, 2023.

Dated:  February 16, 2023                                  RUDOLPH CONTRERAS
                                                           United States District Judge